**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No.  RDB-19-0355** |
| | * | |
| **TRAYVON HALL,** | * | |
| | * | |
| **a/k/a Tru,** | * | |
| | * | |
| **Defendant.** | * | |
| | ****** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Defendant, Trayvon HALL, a/k/a "Tru," is the leader of an extremely violent Baltimore set of the Crips gang known as the Eight Tray Gangster or "ETG" Crips.  As a twice-convicted felon, he is fully aware that he is prohibited from possessing firearms.  Nonetheless, on July 14, 2019, he rented and fired a handgun at an indoor firing range, posted a video of it to his Instagram account, and added comments essentially boasting that he was engaging in target practice for the purpose of avenging the murder of a fellow Crips member.  On July 31, 2019, the FBI executed a search warrant at the Defendant's residence and recovered a loaded .40 caliber handgun from the Defendant's vehicle.  They also recovered the Defendant's iPhone, which contained text messages establishing that he had recently obtained that .40 caliber handgun from a fellow Crips member in exchange for a 9mm caliber firearm that was used to commit the May 19, 2019 attempted murder of Joseph Williams, a/k/a "Blue."  A wealth of evidence demonstrates that the Defendant participated in that attempted murder, provided the weapon to the shooter, and served as the getaway driver.

On August 10, 2020, the Defendant is expected to plead guilty to one count of being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1).  This is a case in which the

stipulation of facts in the plea agreement does not begin to capture the seriousness of the offense or the Defendant's dangerousness.   Below, we provide the Court with a general overview of the Defendant's offense and related conduct, his history and characteristics, the need for deterrence, and—most importantly—the need to protect the public from him.   Upon consideration of all of these factors, the Government believes that a sentence of 3 years of imprisonment, followed by 3 years of supervised release, is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553.   Notwithstanding the Defendant's arguments, a low-end or below-Guidelines sentence does not serve the ends of justice, and would seriously endanger the public.

## I.   FACTUAL BACKGROUND

### A.   <u>Background of Investigation</u>

The FBI began investigating HALL as part of a larger investigation into criminal gang activity, drug trafficking, and firearms offenses by a violent Baltimore subset of the Crips gang known as the "Eight Tray Gangster" or "ETG" Crips.   Numerous homicides and shootings have been linked to this organization.   Based on information provided by multiple confidential sources, and corroborated by publicly available posts on social media websites, the Defendant, Trayvon HALL, a/k/a "Tru," a/k/a "G-Tru," is the leader of the Eight Tray Gangster Crips in Baltimore, and Devon POWELL, a/k/a "Smuppy," is a member of the organization under HALL.

In June 2019, law enforcement determined that HALL was using the Instagram account with username la_cabra_83.   The profile picture associated with the account was a photograph of HALL, and the tagline for the account included the name "Tru," which is a known alias for HALL.   In addition, the profile included numerous publicly available photographs and videos that depicted

HALL, some of which appear to have been taken at close range using the "selfie" mode of his cell phone.  Attached as Exhibit 1 are publically available posts from HALL's Instagram account la_cabra_83.

Between February 2018 and July 2019, HALL posted numerous publicly available photographs, videos, and comments to his Instagram account in which he made reference to his affiliation with the Crips gang and to his involvement in violence and drug trafficking.  *See* Ex. 1. For example, on February 20, 2019, HALL posted a photograph of himself with the comment: "If u from Baltimore Hilton n you ever been city jail or the system u say u from there they goin ask u bout TRU crip nigga rather [sic] they hate me or got luv for me u goin hear that Respect in they voice that'z factz they all tell my War story's I never lost I move like a vet when it's war u will never see me but I allways see u I control the temperature u don't gotta ask bout me cause they already talk."  *Id.* at 38.  In other words, HALL is indicating that he gained notoriety as a Crips leader from the area of Baltimore Street and Hilton Avenue who has been involved in violent disputes—*i.e.*, "wars"—with rival organizations.

On March 14, 2019, HALL posted a series of photographs along with the comment: "Kstreet to the death of me I'm glue it all bac together this summer mandatory… remember my first pack .C told me be4 I go buy sum shoes buy a tool I been strap seens than day forever love that nigga #Hilton."  *Id.* at 35.  "Kstreet" is a reference to Kossuth Street, a street near the intersection of Baltimore Street and Hilton Avenue where HALL's ETG Crips gang operates.  In this post, HALL is indicating that he remembers selling his first "pack" of drugs; that he was advised to buy a gun (a "tool") right away for protection; and that he has carried a gun ("been strap") since that day.  In one of the photographs accompanying the comment, HALL

superimposed a cartoon rat over the face of an individual standing next to him—which is a signal to other Instagram users that the individual is suspected of cooperating with law enforcement (or "ratting") against the gang.

On May 19, 2019, HALL posted a photograph of him posing for the camera with a group of individuals, including Devon POWELL, a/k/a "Smuppy."  *Id.* at 18.  In the photograph, POWELL and a number of others in the group are making Crips gang signs and/or wearing blue bandanas for the Crips.  HALL posted a comment to the photograph that read "3rd war."  Another user posted a comment to the photograph that read "M823VN GanG [emojis] #CRIP4LIFE."  Blue is the color of the Crips gang, and the comments are references to the Eight Tray Gangster Crips gang.  Similarly, on June 9, 2019, HALL posted a photograph of himself standing next to POWELL along with the caption "Eighty 3 GC."  *Id.* at 13.  "Eighty 3 GC" is a reference to the Eight Tray Gangster Crips gang.  In the photograph, POWELL is making a Crips gang sign and wearing blue shorts and a blue baseball cap.

On June 14, 2019, FBI investigators obtained a search warrant for HALL's Instagram account with username la_cabra_83.  The returns from Instagram showed that HALL had listed his phone number as (410) 493-9892.  Investigators issued a subpoena to Sprint, which revealed that the billing account number associated with (410) 493-9892 was 515079032, and was listed to John Doe of 910 Holgate Drive, Apartment A, Essex, Maryland.  Investigators also checked the (410) 493-9892 phone number in the Maryland jail call database and found that there were several jail calls made from inmates to this number.  Upon listening to several of the calls, investigators were able to determine that the user of the (410) 493-9892 number was HALL by comparing the voice to HALL's voice in videos posted to his Instagram account.

Another subpoena served on Sprint showed that on May 20, 2019, the phone number (410) 493-9892 was cancelled, and phone number (410) 717-3342 was activated under the account with billing account number 515079032.  Toll records for (410) 717-3342 spanning from May 20, 2019 through July 10, 2019 showed that (410) 717-3342 was in communication with many of the same telephone numbers as (410) 493-9892.  Therefore, the evidence indicates that HALL was using phone number (410) 493-9892 before May 20, 2019, and phone number (410) 717-3342 after May 20, 2019.  As will be discussed further below, the date on which HALL switched his phone number is significant because it was the day after the attempted murder of Joseph Williams.

**B.** **Instagram Post of HALL Firing Handgun at Firing Range**

On July 18, 2019, investigators were monitoring the publicly available posts on HALL's Instagram account, la_cabra_83, when they observed a video posted on July 14, 2019 that showed HALL firing a gun at an indoor gun range.  *See* Ex. 1, at 5 (still shot from video).  HALL added the caption "#OnMitch I never miss the target."  "Mitch" is a reference to Maurice Finney, a/k/a "Mitch," a fellow Crips member who was gunned down by a rival on July 17, 2017.[1]  HALL is also wearing a white t-shirt with the words "ON MITCH" on the back in a font that is made to look like dripping red blood.  In this post, HALL was broadcasting to fellow Crips members and rivals that he is engaging in target practice for the purpose of avenging Finney's murder.  Another Instagram user responded "Teach these niggas bro.  They be shooting at squirrels n roaches."

HALL has been convicted of a crime that is punishable by more than one year in prison, and is therefore prohibited from possessing firearms or ammunition.  Specifically, on July 16, 2018, HALL was convicted of CDS: Possession with Intent to Distribute: Narcotics in Baltimore

---

[1]      Cortez WEAVER plead guilty to Finney's murder in a related case in front of Your Honor.  *See United States v. Cortez Weaver*, RDB-19-0144.

County Circuit Court Case No. 03-K-18-000716.  HALL was aware that this crime was punishable by more than one year because he received a sentence of three years of incarceration, all suspended.

Based on visual clues in the Instagram video, including the style of the firing lanes, investigators believed HALL had visited FreeState Gun Range, which is located at 11500 Crossroads Circle, Middle River, Maryland.  A subpoena was obtained for records of HALL's visit.

Investigators responded to FreeState Gun Range and spoke with staff members. The investigators were advised by the staff that anyone who uses the gun range must fill out an electronic indemnification, waiver, and release agreement.  HALL's name was provided to staff members, who were able to confirm that on July 14, 2019, HALL did in fact visit the range and fill out the electronic form.  On the electronic form, HALL filled out his name as "Trayvon Hall"; his date of birth as June 21, 1991; and his email address as trayvonhall@yahoo.com.  In response to the question, "Have you ever been convicted of any crime punishable by more than one (1) year?" HALL lied and wrote "No."

A FreeState staff member also provided HALL's purchase receipt, which showed that on July 14, 2019 at 1:05 p.m., HALL rented a lane for one hour (with a second shooter), purchased one target and two boxes of 9mm ammunition (each containing 50 rounds), and rented a gun.  He paid by Visa credit card.

Investigators were also able to access video surveillance footage from July 14, 2019.  By doing so, it was determined that HALL and a female known to investigators to be Ashley David entered the location at approximately 12:18 p.m.  Both HALL and David were observed approaching the kiosk where customers would fill out their electronic forms.  A staff member was

able to verify that David's information was also entered into the system. Both HALL and David listed their address as being 1437 Hadwick Drive, Essex, MD 21221.  Both HALL and David provided the phone number 410-499-9413, which investigators identified as David's phone number.  Upon completing the electronic form, HALL and David approached the customer counter, where they rented a handgun and purchased a target and ammunition.  The video footage showed HALL later firing the gun.

Based upon a review of the footage, it was clear to investigators that the firearm rented by HALL and David was a Glock. A staff member was able to verify, through his experience and the tag on the firearm, that the firearm was a Glock Model 17. The staff member also advised that the shop has only one Glock 17 that is rented to customers, and he was able to retrieve it for the investigators.  The firearm was a Glock Model 17 9mm handgun bearing serial number BFZW043. The staff member advised that he was certain that this was the gun that HALL and David were observed firing.  On July 22, 2019 investigators returned to FreeState Gun Range and took custody of the firearm.

The Glock firearm rented by HALL and the 100 rounds of ammunition purchased by HALL were manufactured outside the state of Maryland, and therefore traveled in interstate commerce before being possessed by HALL on July 14, 2019.

**C. Execution of Search Warrant at HALL's Residence on July 31, 2019 and Recovery of Loaded .40 Caliber Handgun and HALL's iPhone**

 On July 24, 2019, a grand jury for the District of Maryland returned an indictment charging HALL with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g).  An arrest warrant was issued the same day by U.S. Magistrate Judge J. Mark Coulson.  On July 30, 2019, U.S. Magistrate Judge Stephanie A. Gallagher authorized search

8

warrants for HALL's residence, 1427 Hadwick Drive, Essex, Maryland; a red Mitsubishi SUV with Maryland plate 3DR7595 that HALL had been seen operating; and HALL's Apple iPhone with phone number (410) 717-3342.

On July 31, 2019, FBI agents and task force officers arrested HALL outside 1437 Hadwick Drive and executed the search warrants.  During a search of the red Mitsubishi, investigators recovered a .40 caliber Smith & Wesson M&P 40 pistol bearing serial number HLA8409.

In August 2019, investigators searched HALL's Apple iPhone pursuant to the search warrant.  The search confirmed that the last used phone number associated with the phone was (410) 717-3342, and that the phone was previously associated with phone number (410) 493-9892. *See* Exhibit 2 (Selected Data from Hall iPhone Extraction), at 1.

Many of the text messages in the phone reference conspiracies to commit violence in furtherance of the Crips gang.  For instance, investigators discovered text messages between HALL and phone number (443) 835-0932, which was saved in the "Contacts" as "Smuppy G." *See id.*  As discussed above, "Smuppy," is a known alias of ETG Crips member Devon POWELL. On June 9, 2019, "Smuppy G" sent HALL three photographs of POWELL standing with HALL and making Crips gang signs.  *See id.* at 13–16.  Accordingly, it is clear that the phone number (443) 835-0932, saved as "Smuppy G," was in use by POWELL.

On May 26, 2019, POWELL and HALL exchanged the following text messages in which they discussed swapping a .40 caliber firearm for a 9mm caliber firearm:

| +14107173342 | 5/26/2019 12:20:48 PM(UTC-4) | Sup 3 I got this sig 9 an a buck to trade wit u for that 40 |
| +4438350932 Smuppy G | 5/26/2019 12:23:08 PM(UTC-4) | Tryna give me the lemon juice boi |

| +14107173342 | 5/26/2019 12:27:24 PM(UTC-4) | Should be good I banged they whole clip out last night [emoji] prolly needed to be clean or u was hitting the trigger like it was a glock bull cause it was 15 in der was only 7 left so it bang like 7times be4 that happen up to u tho I'll load it up again n come bang another clip out n show u |
| +14107173342 | 5/26/2019 12:28:24 PM(UTC-4) | N stil can find somebody trade it wit if u want I'm jus tryna get that be4 u try give it bac tell yo tip got chip wit it |
| +4438350932 Smuppy G | 5/26/2019 12:33:54 PM(UTC-4) | He never getting it bacc boi ots he just sent my uncle over here to try and talk to me but idk 3 dis my favorite bippy cuz Ima see if my lor man tryna trade his shit |
| +14107173342 | 5/26/2019 12:35:22 PM(UTC-4) | Wat kind he got |
| +14107173342 | 5/26/2019 12:46:48 PM(UTC-4) | [video attachment showing HALL disassembling a firearm] |
| +14107173342 | 5/26/2019 12:46:48 PM(UTC-4) | Cleaning this botch again ukno how take urs apart ? |
| +4438350932 Smuppy G | 5/26/2019 12:48:15 PM(UTC-4) | 40 it's dirty though and I just looked it up on YouTube |
| +14107173342 | 5/26/2019 12:49:57 PM(UTC-4) | Shid idc how dirty it is see if he tryna swap tell it's a dig sauer sp 2022 it's built like a 40 it's military addition 9 |
| +4438350932 Smuppy G | 5/26/2019 12:53:02 PM(UTC-4) | I got u 3 bout to go see if he outside |
| +14107173342 | 5/26/2019 12:53:07 PM(UTC-4) | Okill |

*Id.* at 9–12.

In summary, in this conversation, HALL is attempting to convince POWELL to trade a

.40 caliber firearm of POWELL's for a 9mm caliber Sig Sauer SP2022 firearm belonging to

HALL.  POWELL indicates his familiarity with the 9mm firearm HALL is trying to trade, calling

it "that lemon juice"—which is a reference to a firearm that does not work properly.  HALL replies

that the firearm should work properly now ("Should be good"), and that it probably just needed to be cleaned, or that perhaps POWELL was not using it properly ("or u was hitting the trigger like it was a glock"). **HALL then refers to a specific incident in which POWELL fired the gun 7 times before it jammed ("it was 15 in der was only 7 left so it bang like 7times be4 that happen up to u tho").** POWELL replies that he does not want to sell his .40 caliber firearm, as it is his "favorite bippy," but he will see whether his "lor man" wants to trade his firearm. HALL asks what kind of firearm POWELL's "lor man" has, and POWELL responds that it is a .40 caliber firearm, but that it is "dirty"—which means that the firearm has been used to shoot or kill someone.

As indicated above, HALL also sent POWELL a video of himself disassembling a firearm. *Id.* at 11. FBI investigators were able to determine that the firearm in the video is a 9mm caliber Sig Sauer SP2022. More importantly, it appears to be the *same* 9mm caliber Sig Sauer SP2022 that was later recovered from Devon POWELL on June 26, 2019, and that was used to commit the attempted murder of Joseph Williams on May 19, 2019. This attempted murder will be discussed further below. Attached as Exhibit 3 is a photographic comparison of the firearm in the video in HALL's phone and the firearm recovered from POWELL and used to shoot Williams.

Based on a review of earlier text messages in HALL's phone, investigators were able to determine that HALL previously communicated with POWELL on the number (410) 371-7263. Specifically, on May 7, 2019, HALL sent a text message to (410) 371-7263 saying: "Smuppy G .. how u feeling 3," to which the user of (410) 371-7263 responded, "I'm coolin 2 with Gc we bout to shoot this video real quicc." Ex. 2, at 8.

Previous text messages between HALL and POWELL's (410) 371-7263 number discuss the formation of the Eight Tray Gangster Crips, as well as violence committed in furtherance of

the gang.  *See id.* at 2–8.  For instance, HALL and POWELL exchanged the following text messages in February 2019:

| | | |
|---|---|---|
| +14104939892 Tru (owner) [HALL] | 2/10/2019 10:57:55 AM (UTC-5) | Okill yea 3 the one that solidified us in LA for Baccwest big menace also known as lil solo but I got the blue light be4 cuz from my 3 from Ny name bizzz lok he in the feds fighting a body right now but menace it's a lot goin. On wit 3 I'm trying find out but the General from the Baccwest is baby diamond also know ad PD paco diamond he a Og of the set he jus came home this year from like 17yr |
| +14104939892 Tru (owner) [HALL] | 2/10/2019 11:01:28 AM (UTC-5) | The whole set is from G to C from gage to century it's big is chit hopefully we can make that trip this year on tray day |
| +4103717263 [POWELL] | 2/10/2019 11:03:02 AM (UTC-5) | Yea me and Leeky was talking bout the 3 menace he said it's a bunch of stuff going on with 3 and you changed the set for homies forever 3 you put your life on the line to make sure we got the recognition and respect we deserve I will forever respect you for that and this history is going in the memory bank 3 I'm definitely tryna take that trip this year I missed all the ones before not this year though |
| +14104939892 Tru (owner) [HALL] | 2/10/2019 11:06:25 AM (UTC-5) | Tru indeed we lost love ones to this so I had make sure it was stamped even if it cost me my life so that the homies wouldn't had died in vain on something that wasn't real now we have our own history 3 that nobody can take away they try to an I made them niggas pay for it |
| +4103717263 [POWELL] | 2/10/2019 11:09:49 AM (UTC-5) | I already know 3 that's why I respect you so much like I told you before regardless of what my role is I'm going to play it 300% I don't have pride when it comes to the advancement of our family I love this chit the way you love it and I would've been stride for stride with u if I had the opportunity to |
| +14104939892 Tru (owner) [HALL] | 2/10/2019 11:14:00 AM (UTC-5) | I believe u 3 shot slowed down once all the homies was goin jail n catching charges like souljia go life plus 22 lor bro was a monster like me frank n all them got jam up police was investigating ran up in my shit trying break the family up so we step bac n had to play it smart because we found out how much noise we was making an the streets took notice that if u fuc wit them eight tray niggas they was goin kill multiple ppl behind it but that brought fear n the police n |

| | | investigators came with that so we smarting up but we made our point nobody want that smoke wit us in Baltimore City |
|---|---|---|

*Id.* at 2–6.

### D.  Attempted Murder of Joseph Williams on May 19, 2019

As noted above, there is a wealth of evidence establishing that the Defendant participated in the May 19, 2019 attempted murder of Joseph Williams, a/k/a "Blue," in furtherance of the ETG Crips—and specifically, that he provided the weapon to the shooter, and served as the getaway driver.

On May 19, 2019, at approximately 8:11 p.m., there was a call for a shooting in the 4900 block of Greencrest Road in Baltimore, Maryland.  The victim, Joseph Williams, was shot multiple times in the lower body but survived his injuries.  Investigators recovered four 9mm caliber casings from the crime scene.

Approximately one week later, on June 26, 2019, Devon POWELL, a/k/a "Smuppy," was arrested in Baltimore County for a handgun violation.  The National Integrated Ballistics Identification Network or "NIBIN" produced a "hit" between the 9mm Sig Sauer pistol recovered in connection with POWELL's arrest and the 9mm casings from the scene of the Williams shooting.  A firearms examiner then conducted a microscopic comparison examination of the two sets of casings and confirmed that the casings from the scene of the Williams shooting were fired from the 9mm Sig Sauer pistol.

Investigators recovered security camera footage of the shooting from a residence in the 4900 block of Greencrest Road.  As discussed above, the same day Williams was shot, HALL posted a photograph to Instagram that showed him standing with POWELL and others who are

making Crips gang signs, and he added the comment "3rd war."  I believe the comment "3rd war" is a reference to violence carried out in furtherance of the Eight Tray Gangster Crips, which are often denoted by the number "3."  In the Instagram photograph, both POWELL and HALL are wearing distinctive clothing.  For instance, POWELL is wearing a gray t-shirt with distinctive blue markings on it, and HALL is wearing a white t-shirt with distinctive black, yellow, and green markings on it.  By comparing the Instagram photograph to the security camera footage from the 4900 block of Greencrest, investigators were able to identify both POWELL and HALL in the footage.  The footage shows POWELL and HALL walking and talking together in the rear alley behind the 4900 block of Greencrest less than half an hour before the shooting.  They then walk off camera.  Seconds before the shooting, a red SUV drives by the rear alley.  The red SUV strongly resembles HALL's red Mitsubishi SUV with Maryland plate 3DR7595.  The victim, Joseph Williams, begins to walk down the alley.  POWELL runs up behind Williams and fires a gun at him repeatedly.  Williams falls.  POWELL fires more shots at Williams as he lies on the ground and then flees around the corner in the direction of the red SUV.  The security camera from the front of the residence then shows the red SUV drive away, and there is no sign of POWELL on foot, indicating that POWELL got into the red SUV after shooting Williams.

The data extraction from HALL's iPhone shows that on May 19, 2019, at 9:35 p.m.—a little over an hour after Williams was shot—HALL searched for "twitter police."  In addition, Sprint records show that on May 20, 2019, the day after Williams was shot, HALL switched to a new cell phone number.  It is exceedingly common for people who commit acts of violence to (a) search for police reports about the act of violence in order to determine whether the victim died and whether the police have uncovered any evidence that might implicate them in the crime, and

14

(b) change phone numbers so as to make it harder for police to tie them to the scene or to the victim using cell phone communications or location information. The fact that HALL took both these steps in the immediate aftermath of the shooting further implicates him in the crime.

As discussed above, on May 26, 2019, one week after Williams was shot, HALL and POWELL exchanged text messages in which HALL alluded to an incident in which POWELL had fired HALL's 9mm caliber Sig Sauer SP2022 roughly 7 times before it jammed. *See* Ex. 2, at 9–12. HALL also sent POWELL a video of himself disassembling the firearm. *See* Ex. 3. It is clear based on the video, the ballistic match, and the context of the conversation that they were discussing the shooting of Joseph Williams.

Based on the ballistic match, the surveillance camera footage of HALL with POWELL at the scene of the shooting and HALL's vehicle fleeing the shooting, HALL's Instagram post with POWELL at the scene of the shooting, the text message conversation between HALL and POWELL in which they discuss the gun used in the shooting, and HALL's web search for "police twitter" and change of his phone number immediately after the shooting, there is overwhelming evidence that HALL participated in the attempted murder of Joseph Williams as an aider and abettor—both by providing the 9mm firearm that POWELL used to shoot Williams, and by driving POWELL from the scene.

**II. DISCUSSION**

  **A.**   **Applicable Standards at Sentencing**

Almost seven decades ago, the Supreme Court recognized the special character of criminal sentencing proceedings:

> Highly relevant—if not essential—to [the judge's] selection of an appropriate
> sentence is the possession of the fullest information possible concerning the

> defendant's life and characteristics.   And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigorous adherence to restrictive rules of evidence properly applicable to the trial.

*Williams v. State of New York*, 337 U.S. 241, 247 (1949).  That principle is codified for sentencing proceedings in the federal criminal courts by 18 U.S.C. § 3661, which provides that:  "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Because of the need to present broad information concerning the defendant's past history, behavior, and character, sentencing proceedings operate by more relaxed procedural rules that trials.   For instance, the Confrontation Clause does not apply to non-capital sentencing proceedings.  *Williams v. United States*, 337 U.S. 241, 250 (1949).  *See also United States v. Francis*, 39 F.3d 803, 810 (7th Cir. 1994) ("the pre-Guidelines policy of allowing sentencing courts to obtain all relevant sentencing information without the strictures of the right of confrontation remains intact"); *United States v. Silverman*, 976 F.2d 1502, 1510 (6th Cir. 1992).  Likewise, the Federal Rules of Evidence do not apply to sentencing proceedings.  FED. R. EVID. 1101(d)(3).  *See also* U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the Court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.") & (comment.).

The Government may therefore present at sentencing a wide range of information about a defendant's character and past conduct derived from many sources.   These include written statements of counsel, grand jury testimony, affidavits of witnesses, law enforcement reports, and

summary testimony by law enforcement officers.  *See* U.S.S.G. § 6A1.3(a) & (comment.) ("Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy."); *Williams*, 337 U.S. at 246 (noting with approval the use of affidavits in sentencing proceedings); *Francis*, 39 F.3d at 809-811 ("a sentencing judge is free to consider a wide range of information, including hearsay evidence, regardless of its admissibility at trial"); *United States v. Zuleta-Alvarez*, 922 F.2d 33, 36 (1st Cir. 1990) (grand jury testimony is presumptively reliable for sentencing purposes); *United States v. Terry*, 916 F.2d 157, 160-61 (4th Cir. 1990) ("The trial court may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain."); *United States v. Fatico*, 579 F.2d 707, 712 (2d Cir. 1978) ("Due Process does not prevent use in sentencing of out-of-court declarations by an unidentified informant where there is good cause for the nondisclosure of his identity and there is sufficient corroboration by other means.").

This more flexible approach at sentencing is justified by the need for the trial court to have access to the widest possible array of information about the defendant's character and conduct, while still preserving its ability to assimilate this information in a proceeding less formal and protracted than a criminal trial.  *See Williams*, 337 U.S. at 246 ("The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mode of trial procedure."); *United States v. Agyemang*, 876 F.2d 1264, 1271 (7th Cir. 1989).

Finally, it is well-established that unlike a jury's verdict, which must be based on proof beyond a reasonable doubt, the standard of proof for findings of fact at sentencing is a simple preponderance of the evidence.  *See, e.g.*, *United States v. Grubbs*, 585 F.3d 793, 798–803 (4th Cir. 2009); U.S.S.G. § 6A1.3, Cmt. ("[U]se of a preponderance of the evidence standard is

appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").   Clear Supreme Court and Fourth Circuit precedent holds that a sentencing court may consider uncharged—and even acquitted— conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 154 (1997) ("[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been prove by a preponderance of the evidence."); *Rita v. United States*, 551 U.S. 338, 352 (2007) (noting that "many individual Guidelines apply higher sentences in the presence of special facts," and "[i]n many cases, the sentencing judge, not the jury, will determine the existence of those facts"); *Witte v. United States*, 515 U.S. 389, 399–401 (1995) (approving district court's consideration of other drug transaction, not just drugs involved in offense of conviction, in calculating drug quantity under the guidelines, resulting in a guidelines range that was over 200 months higher than it otherwise would have been, but still within the statutory maximum); *Grubbs*, 585 F.3d at 798–800 (collecting cases).

## B.  Advisory Sentencing Guidelines

The base offense level is **20** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2K2.1(a)(4)(A) because the defendant committed the offense subsequent to sustaining a felony conviction of a controlled substance offense.  ECF 23 (Presentence Investigation Report), at ¶ 14.

Provided that the Defendant complies with the terms of the Plea Agreement, the Government will recommend a three-level reduction in his adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based on his timely acceptance of responsibility.  The total offense level would therefore be **17**.  ECF 23 at ¶ 23.

18

The Defendant has a serious criminal history that includes a felony crime of violence as well as a felony drug offense—specifically, a 2018 conviction for Assault Second Degree, and a 2018 conviction for CDS: Possession with Intent to Distribute: Narcotics, both in the Circuit Court of Maryland for Baltimore County.  ECF 23, at ¶¶ 29–30.  Because of the sentences he received in those cases, they each score only one point under the Sentencing Guidelines.  *Id.*  However, the Defendant committed the instant offense while on probation in the drug case, so two points are added.  ECF 23, at ¶ 32.  With 4 criminal history points, he is in criminal history category III.  ECF 23 at ¶ 33.

Based on an offense level of 17 and criminal history category III, the advisory Sentencing Guidelines range is **30 to 37 months** of incarceration.  ECF 23, at ¶ 49.  The statutory maximum is **ten years**.  *See* 18 U.S.C. §§ 922(g), 924(a)(2).[2]

This is not a guilty plea under Federal Rules of Criminal Procedure 11(c)(1)(C).  However, pursuant to paragraph 9 of the Plea Agreement, the Government has agreed not to recommend a sentence of greater than **37 months**.

**C.  Analysis of Factors Under 18 U.S.C. § 3553**

The offense at issue is extremely serious.  The Defendant, a twice-convicted felon, rented and fired a gun at an indoor firing range, posted a video of it to his Instagram account, and bragged to the world that he was engaging in target practice for the purpose of avenging a fellow Crips member's murder.

---

[2]     The PSR mistakenly states that the maximum term of imprisonment is 20 years.  ECF 23, at ¶ 48.  The statutory maximum is 10 years for a violation of 18 U.S.C. § 922(g) unless the Defendant qualifies as an Armed Career Offender, in which case the statutory maximum is life and there is a mandatory minimum term of imprisonment of 15 years.  The Armed Career Criminal Act does not apply in this case, so the statutory maximum is 10 years.

19

That conduct alone is serious.  But this is a case in which the stipulation of facts in the plea agreement does not begin to capture the gravity of the offense and the related conduct, or the Defendant's extreme dangerousness.

The Defendant is the leader of an extremely violent Baltimore subset of the Crips gang. As described in detail above, he bragged about his leadership role in the gang on Instagram and discussed the history and formation of the gang in text messages with his fellow Crips members. More importantly, there is overwhelming evidence that he participated in the attempted murder of Joseph Williams on May 19, 2019 with his Crips underling Devon POWELL, a/k/a "Smuppy." Williams was brutally shot multiple times at close range, and he was lucky to survive the attack. HALL consulted with POWELL immediately before the shooting (as shown on surveillance footage), provided him with the 9mm caliber firearm he used to commit the shooting, and served as the getaway driver.  And in the weeks following the attempted murder, HALL swapped the "dirty" 9mm caliber firearm POWELL had used to shoot Williams for the .40 caliber firearm that was recovered from his vehicle by the FBI on July 31, 2019.

The Court should also take into account that the Defendant has a serious criminal history that includes both a crime of violence and a drug felony offense.  Making matters worse, he was still on probation for the drug offense when he committed the instant offense, meaning that he has been undeterred by criminal justice sentences in the past.

Furthermore, there is a compelling need for general deterrence in this case.  Baltimore is overwhelmed by gun violence.  There were 343 homicides in Baltimore in 2017,[3] the highest per

---

[3]     *See The Baltimore Sun*, Baltimore Homicides, Yearly Data, *available online at* http://data.baltimoresun.com/news/police/homicides/ (last visited February 7, 2018).

20

capita rate in the city's history.[4]  Gun violence has a devastating impact on Baltimore communities, and combatting it ought to be a top criminal justice priority.  A 36-month sentence will send a clear message that the illegal possession of firearms will not be tolerated or met with a slap on the wrist—particularly when there is evidence those firearms were used in violent crimes.

Finally, and most importantly, there is an urgent need to protect the public from future violent crimes by HALL, and that should be reflected in his sentence.   Quite simply, this is a case in which the need to protect the public from the Defendant is paramount.

A sentence of 3 years is in the heart of the advisory guidelines range of 30 to 37 months.  A low-end or below guidelines sentence is not appropriate in this case, which involves aggravating factors not fully captured by the guidelines—namely, the Defendant's leadership of a violent Crips gang; his unlawful possession of yet another .40 caliber firearm at his residence on July 31, 2019; and, most significantly, his involvement in an brutal attempted murder on May 19, 2019.

## III.    CONCLUSION

The Government believes that a sentence of 3 years of imprisonment, followed by 3 years of supervised release, is sufficient but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553.  Such a sentence is in the heart of the advisory guidelines range of 30 to 37 months.  A substantial period of incarceration is necessary (1) to reflect the seriousness of the offense and the related conduct—a leadership role in a murderous gang and involvement in a brutal shooting; (2) to afford adequate deterrence for criminal activity that has a

---

[4]      *See, e.g.*, *Reuters*, "'Out of control': Murder rate in Baltimore worst ever, Chicago paces record high," May 2, 2017, *available online at* https://www.rt.com/usa/386782-baltimore-chicago-murder-rate/.

21

devastating impact on the community; and, most importantly, (3) to protect the public from an

extremely violent and dangerous defendant.


Respectfully submitted,

Robert K. Hur
United States Attorney

By:  _____/s/_____
Christina A. Hoffman
Peter J. Martinez
Assistant United States Attorneys
36 S. Charles St., Fourth Floor
Baltimore, Maryland 21201

22

## **CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on August 7, 2020, a copy of the foregoing Government's Sentencing Memorandum was served electronically through the Clerk of the United States District Court using CM/ECF, to:

     Jose Molina, Esq.
     Counsel for the Defendant


               _____/s/_____
               Christina A. Hoffman